UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| THOMAS J. GARROW and DAWN K. GARROW, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 08-4066 |
| NORCROSS SAFETY PRODUCTS, LLC., | ) ) ) | |
| Defendant. | ) | |

# O R D E R

This matter is before the Court on Defendant, Norcross Safety Products' ("Norcross") Motion for Summary Judgment. For the reasons set forth below, Norcross' Motion for Summary Judgment [#25] is GRANTED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are of diverse citizenship, and the amount in controversy exceeds $75,000.00.

## BACKGROUND

Plaintiff Thomas Garrow ("Garrow") began working at Norcross through a temporary staffing agency in March 2007 before becoming a full-time employee in April 2007. He was hired as lead for a temporary project known as the Black Vinyl Overboot ("BVO") project. Garrow worked in that position until the end of July 2008, when he moved to his current position.

As the lead on the BVO project, Garrow was responsible for overseeing the testing of previously manufactured military boots to determine if the boots were properly made. Employees in the BVO unit were cross-trained and their duties included unpacking boxes

of boots, separating boots, turning boots inside out, testing boots, and repackaging boots after testing. Garrow was responsible for directing the work of others in the BVO unit who were subordinate to him and reported to him first before reporting to Cory Pancrazio, the supervisor of the BVO unit. At the time relevant to this litigation, Garrow worked the first shift, from 6:00am to 2:30pm.

Jonathon Ozmon ("Ozmon") was hired by Norcross in approximately April or May 2007. Prior to being hired, Norcross obtained a background check on him, including a check for any criminal record for at least seven years preceding the employment application. Lena Marxen ("Marxen"), an employee in Norcross' Human Resources office, testified that the background check revealed no criminal convictions and did not raise any red flags. Marxen further testified that had the background check revealed any type of violent act, Ozmon would not have been hired. However, if the background check had revealed a felony conviction, it would not have automatically disqualified Ozmon from employment; rather, it would have depended on the type of felony and whether the record showed that it had involved some type of violent act.

As of June 2007, Ozmon had worked in the BVO unit for approximately one month. Ozmon was not a supervisor and had no management role. He reported to Garrow. Prior to that day, Garrow believed that he and Ozmon had a good working relationship. For example, Garrow would bring Ozmon sandwiches and water because Ozmon never brought food with him to work.

On June 6, 2007, Garrow spoke to Ozmon regarding his performance and told him that he was talking too much and causing other people to not get their work done. This conversation was non-confrontational, and Ozmon did not say anything threatening to

Garrow at that time. Prior to that day, Garrow had never spoken to Ozmon about his performance.

On the morning of June 7, 2007, Heather Young ("Young"), another BVO unit employee, told Garrow that near the end of the shift on the previous afternoon, Ozmon had stated to her that he would "kick [Garrow's] ass" if he fired him. After speaking with Young, Garrow asked Ozmon to step away from the line so that no one would be able to overhear their conversation. Garrow's version of the conversation is that he asked Ozmon if he made a threatening comment the day before, and Ozmon confirmed that he had. Garrow informed Ozmon that making such comments could get him fired, and Ozmon responded, "fire me now, because I'll punch you in your face right now." Garrow stated that he did not say that he was going to fire Ozmon and walked away. Ozmon's version differs somewhat. According to Ozmon, Garrow told him that "he heard [Ozmon] had been talking crap about him and he would get [Ozmon] fired." Ozmon denies threatening Garrow at that time.

There is a dispute regarding what time in the morning Garrow talked to Pancrazio,[1] but it is undisputed that at some time prior to 8:30am on the morning of June 7, 2007, Garrow spoke with Pancrazio about his conversations with Young and Ozmon. Garrow did not ask to have Ozmon fired or to remove him from the plant floor. Pancrazio did not have the authority to fire or discipline Ozmon, but stated that he would contact Human Resources and "take care of the situation." Garrow does not know what Pancrazio did right after they finished speaking.

---

[1] The Complaint alleges that Garrow spoke with Ozmon shortly after 8:00am. Garrow testified in his deposition that he could not recall whether he spoke with Pancrazio at 7:10am or 8:10am. Pancrazio testified that he spoke with Garrow between 8:20 and 8:30am.

At 8:30am, Garrow went on break. It took him less than a minute to walk to the break room, which is located in a building next to the BVO line. He did not see Ozmon as he was walking to the break room. In the break room, Garrow heated a piece of pizza in the microwave and sat down at a picnic table to eat. According to Garrow, he had been sitting at the picnic table for about one minute when Ozmon came in and struck him from behind. He fell to the floor, and when he got to his feet, Ozmon charged him, picked him up, and then dropped him to the ground. While Garrow was on the ground, Ozmon continued to hit him with his fists. Garrow testified in his deposition that he was completely surprised by Ozmon and did not expect him to come in and hit him.

Ozmon's version is slightly different. Ozmon states that after entering the break room and getting a drink from the refrigerator, he asked Garrow how "getting him fired was going." He was upset by Garrow's response, so he threw his drink in Garrow's face, at which time Garrow jumped up from the table and punched Ozmon in the face. Ozmon then claims that he responded by throwing repeated punches at Garrow.

Dave Martinez ("Martinez"), a former Norcross employee, stated that he could hear Garrow and Ozmon arguing but could not hear what was being said. He then saw Ozmon hit Garrow with his fist. Martinez observed Garrow attempting to stand up and Ozmon picking him up and slamming him to the ground before people separated them.

Pancrazio testified that immediately after his conversation with Garrow, he walked from the BVO area to his office in a building right next to the BVO area. Within a few minutes of 8:30am, he called Kathi Lannom ("Lannom"), the Director of Human Resources, to report what he had learned from Garrow. Pancrazio and Lannom had been on the phone for less than a minute and were discussing the situation when the altercation

between Garro and Ozmon broke out. Martinez then knocked on Pancrazio's office door and motioned for him to come out. Pancrazio saw Garrow on the floor with Ozmon punching him. He ran over and pulled Ozmon off of Garrow and walked Ozmon out of the room.

Pancrazio then walked Ozmon out to the parking lot, where they were met by Lannom and a security guard. Lannom stated that she had called the police and that they would be coming to the plant. Lannom informed Ozmon that he was no longer employed by Norcross and watched him leave the premises.

Following the altercation, Garrow's son, Justin, who was also employed at Norcross, walked Garrow to the medical room. Norcross offered to have an ambulance take him to the hospital, but Garrow opted to have his son take him. While at the hospital, Garrow spoke with the police. The police report indicates that Garrow stated that prior to the attack, Ozmon approached him in the break room and asked "how he felt about hiving fired him, or words to that effect" and that Ozmon attacked him when Garrow asked what he meant. Garrow was discharged from the hospital the same day, and Worker's Compensation covered Garrow's medical bills associated with the altercation with Ozmon.

Prior to the altercation, Garrow had no reason to believe that Ozmon was going to be violent at work. Neither Garrow nor Pancrazio was aware of Ozmon making any threatening statements prior to that day, and Garrow was unaware of any other incidents of violence or physical altercations in the plant prior to his altercation with Ozmon.

Garrow and his wife, Dawn Garrow, brought this Complaint alleging claims for negligent hiring and retention, assault, battery, intentional infliction of emotional distress,

and loss of support/consortium. Norcross has now moved for summary judgment, and this Order follows.

## DISCUSSION

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Celotex, 477 U.S. at 324. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). Summary judgment will be denied where a reasonable jury could return a verdict

for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

The Illinois Workers' Compensation Act (the "Act"), 820 ILCS 305/5(a), is the exclusive remedy for "'accidental' injuries arising out of and in the course of employment." McPherson v. City of Waukegan, 379 F.3d 430, 442 (7th Cir. 2004).  Accordingly, when an accidental injury occurs in the workplace, the Act "establishes liability without fault and abrogates common law defenses," precluding an employee's right to recover damages from the employer for such injuries.  Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago, 104 F.3d 1004, 1016 (7th Cir. 1997).

Norcross first argues that the exclusivity provisions of the Act bar Garrow's claims. Specifically, Section 5(a) of the Act provides:

> No common law or statutory right to recover damages from the employer . . . for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act.

Ill.Rev.Stat. 2009, ch. 48 par. 138.5(a).  Section 11 further states:

> The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsibility of any employer. . . for accidental injuries sustained by any employee arising out of and in the course of employment . . .

Ill.Rev.Stat. 2009, ch. 48 par. 138.11.

Norcross contends that these provisions preclude an employee from bringing claims against his employer for a workplace injury unless the injury: (1) was not accidental; (2) did not arise from his or her employment; (3) was not received during the course of employment; (4) or was not compensable under the Act.  Meerbrey v. Marshall Field and Company, Inc., 139 Ill.2d 455, 463 (Ill. 1990).  It is uncontested that Garrow's injuries arose

out of his employment, were received during the course of employment, and were compensable under the Act. Rather, the dispute lies in whether the injuries were "accidental."

The Act's definition of "accidental" includes those injuries that result from a workplace attack or altercation. Id. Specifically, the Illinois Supreme Court has held that "accidental" under the Act is "not a technical legal term but encompasses anything that happens without design or an event which is unforeseen by the person to whom it happens." Id., *citing* Pathfinder Co. v. Industrial Commission, 62 Ill.2d 556, 563 (Ill. 1976). Consequently, "injuries inflicted intentionally upon an employee by a co-employee are 'accidental' within the meaning of the Act, since such injuries are unexpected and unforeseeable from the injured employee's point of view." Id. Furthermore, "[s]uch injuries are also accidental from the employer's point of view, at least where the employer did not direct or expressly authorize the co-employee to commit the assault." Id.; McPherson, 379 F.3d at 442.

That being said, the exclusivity provisions do not bar "a common law cause of action against an employer where the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer." Meerbrey, 139 Ill.2d at 464. In other words, an employer may be forced to defend against common law claims for damages where "an employer has committed, commanded, or expressly authorized an assault against an employee." Id., at 465.

Garrow cites Quela v. Payco-General Am. Credits, Inc., 84 F.Supp.2d 956, 960 (N.D.Ill. 2000), for the proposition that management's knowledge coupled with a lack of follow-up action is equivalent to express authorization of injurious conduct. *See also,*

Mobley v. Kelly Kean Nissan, Inc., 864 F.Supp.726, 730 (N.D.Ill. 1993); Cline v. General Electric Capital Auto Lease, Inc., 752 F.Supp. 923, 931 (N.D.Ill. 1991). Garrow further argues that an informed ratification by the employer is equivalent to an original authorization for purposes of the Act. Knuepfer v. Fawell, 449 N.E.2d 1312, 1314 (Ill. 1976).

Here, Garrow has conceded that before the day of the altercation, neither he nor Pancrazio was aware of Ozmon making any threatening statements and that Garrow had never reported any threat made by either Ozmon or anyone else at Norcross. Garrow was admittedly unaware of any other incidents of violence or physical altercations in the plant prior to his altercation with Ozmon. Garrow further admits that prior to the altercation, he had no reason to believe that Ozmon was going to be violent at work. Based on these admissions, it is clear that within the meaning of the Act, the injuries sustained by Garrow were "accidental" from Garrow's perspective.

It is undisputed that no one in management at Norcross told Ozmon to attack Garrow. Rather, Garrow attempts to establish that his injuries were not "accidental" from Norcross' perspective by focusing on what he contends to be a lack of a workplace violence policy and corresponding training. According to Garrow's expert, an adequate policy and training would have caused Young to report the threat immediately instead of waiting until the next day, prevented Garrow from confronting Ozmon, and resulted in the immediate implementation of protective measures and notification of the authorities by management. Ignoring his own assertion in the Complaint that he spoke with Pancrazio at 8:10am and construing all facts in the light most favorable to Garrow, it would appear that Pancrazio was notified of Ozmon's threat against Garrow around 7:30am, yet did not

place the call to Lannom in human resources until 8:30am, allowing approximately an hour to elapse before taking action. Garrow contends that this presents a genuine issue of material fact as to whether Norcross' management had knowledge of the threat coupled with lack of follow-up action equivalent to express authorization under Quela.

In Quela, the plaintiff alleged that his supervisor's sexual harassment was subsequently ratified by the employer "who failed to take any action against [the harasser] after having knowledge of the conduct," and "acted with malice and a total disregard for [his] right to be free from the assault and battery." 84 F.Supp.2d at 960. The Court notes that the decision in Quela involved a motion to dismiss rather than summary judgment and is based on the holdings in Mobley and Cline.

Mobley likewise involved a motion to dismiss in a case alleging sexual harassment by a supervisor. 864 F.Supp. 728. Involved were allegations that the employer chose to do nothing in the face of frequent complaints about the supervisor's behavior. Id., at 729-30. Finally, Cline also addressed claims of sexual harassment by a supervisor. 757 F.Supp. at 925-27. Evidence was presented at trial indicating that the employer had received several complaints about the supervisor, yet tolerated and did nothing to address his conduct for several years because he made a lot of money for the company. Id., at 929-31.

In each of these cases, the harmful conduct was perpetrated by a supervisor and continued over time despite repeated complaints to management. That is a different situation from the present case, where the injury was caused by a low-level co-employee with no supervisory authority, decision-making power, or other authority to act on behalf of or make policy for Norcross. As a general rule, low-level employees are not the alter-

ego of the employer, and there is nothing in the record in this case to compel a different conclusion. Walker v. Doctors Hosp. Of Hyde Park, 110 F.Supp.2d 704, 715 (N.D.Ill. 2000), citing Crissman v. Healthco Int'l Inc., 1992 WL 223820, at *6 (N.D.Ill. Sept. 2, 1992). "Ratification can more readily be found and the miscreant employee can more readily be found to be the alter ego of his employer when the miscreant employee acted with supervisory authority given to him or her by the employer." Santos v. The Boeing Company, 2005 WL 1384724, at *4 (N.D.Ill. May 11, 2004).

Moreover, it is undisputed that there was no history of complaints or even any articulable basis to believe Ozmon would be violent in the workplace prior to the morning in question. At most, Norcross had one hour (and possibly as little as 10 minutes) to respond to Garrow's report of Ozmon's threat. Within this time, Pancrazio called Lannom and was determining the proper course of action when the altercation took place. Once the altercation began, it is undisputed that Pancrazio ran into the break room and pulled Ozmon off of Garrow, walked Ozmon out of the room and to the parking lot. Lannom and a security guard met them in the parking lot, and Lannom stated that she had called the police before advising Ozmon that he was no longer employed by Norcross. Lannom and Pancrazio then watched Ozmon leave Norcross' premises.

Garrow has cited no authority supporting the position that stopping an attack, escorting the attacker from the premises, and terminating his employment within 60 minutes of receiving notice of a reported threat by an employee with no history of violence reasonably constitutes knowing inaction or ratification after the fact, and the Court does not find it reasonable to extend existing authority to this extent. The misconduct alleged in each of the cases relied on by Garrow appears to have gone on for much longer periods

of time without any type of response from the employers at all, making these cases factually distinguishable on this basis, as well.

    Garrow then argues that Norcross' workplace violence policy and lack of training failed to protect employees such as himself from workplace violence and lacked any direction to supervisors regarding how to respond to threats or actual workplace violence. He suggests that this, in and of itself, is sufficient to establish that Norcross effectively condoned or authorized Ozmon's attack on Garrow. In support of this position, Garrow offers the expert report of Richard D. Sem ("Sem"), which contains Sem's opinion that Norcross was **negligent** in not having a proper workplace violence policy and training in place prior to the attack by Ozmon. (Sem Expert Report, p. 3)  However, employer negligence falls squarely within the exclusive province of the Act.  Meerbrey, 139 Ill.2d at 469-70; Walker, 110 F.Supp.2d at 714 (noting that the Act abrogates employer liability for all common law negligence claims); Santos, 2004 WL 1384724, at *3; Simmons v. Chicago Public Library, 860 F.Supp. 490-494 (N.D.Ill. 1994).  Garrow cites no caselaw or other legal authority in support of his position that an allegedly inadequate policy/training rises to the level of causing an intentional injury, and the Court has discovered no legal support for this theory in its own research.  Absent legal authority, the Court does not find it reasonable to conclude that a purportedly deficient policy could reasonably be held to constitute express authorization or encouragement of the attack, as would be required to elevate Norcross' response from negligence to intentional wrongdoing.

    Thus, on the record before the Court, no reasonably jury could find that the injuries suffered by Garrow as a result of Ozmon's attack were not "accidental" within the meaning of the Act.  This is summary judgment and mere allegations of intentional injury without

factual support are insufficient. The record is simply devoid of facts or evidence that could support a reasonable conclusion that Ozmon's attack and Garrow's resulting injuries were either expressly authorized, commanded, encouraged, or ratified by Norcross. Nor is there any suggestion of a specific intent by either Norcross or anyone acting as its alter-ego to injure Garrow through the acts of Ozmon. See Walker, 110 F.Supp.2d at 714-15; Fortenberry v. United Air Lines, 1997 WL 457499 (N.D.Ill. 1997). Garrow has not established that any of the exceptions to the Act's exclusivity provisions apply in this case, and his claims are therefore barred. Norcross is entitled to summary judgment on Counts I - IV.[2]

Norcross next takes the position that since Garrow's claims are barred by the exclusivity provisions of the Act, Dawn Garrow's claim for loss of consortium is necessarily barred, as well. Under § 138.5 of the Act:

> No common law or statutory right to recover damages from the employer . . . Is available to any employee who is covered by the provisions of this Act, to any one wholly or partially dependent upon him, the legal representatives of his estate, or any one otherwise entitled to recover damages for such injury.

Ill.Rev.Stat. 2009, ch. 48 par. 138.5(a). As a spouse's loss of consortium claim arises out of the employee's injury, it is dependent on the success of the claim by the employee spouse. Vickery v. Westinghouse-Haztech, Inc., 956 F.2d 161 (7th Cir. 1992); Hetreed v. Allstate Insurance Co., 1996 WL 568784 (N.D.Ill. Oct. 3, 1996); Johnson v. C&L, Inc., 1996

---

[2] The Court would also note that Garrow collected compensation on the premise that his injuries were accidental when Worker's Compensation covered his medical bills associated with his altercation with Ozmon. Illinois courts have held that an injured employee who collects compensation pursuant to the Act cannot thereafter claim that his injuries were intentionally inflicted and outside the Act's provisions. Meerbrey, 139 Ill.2d at 471; Collier v. Wagner Castings Co., 81 Ill.2d 229, 241 (Ill. 1980).

WL 308282 (N.D.Ill. Jun. 3, 1996). Accordingly, as Garrow's claims are barred by the exclusivity provisions of the Act, the claim in Count V for loss of consortium by Dawn Garrow is also barred.

## CONCLUSION

For the reasons set forth herein, Norcross' Motion for Summary Judgment [#25] is GRANTED. All existing deadlines and hearings are vacated, and this matter is now TERMINATED.

ENTERED this 24th day of May, 2010.

s/ Michael M. Mihm
Michael M. Mihm
United States District Judge
